[No. 52584–6.   En Banc.   November 25, 1987.]

KATHLEEN CONSTANCE KIRK, *Respondent,* v. WASHINGTON
STATE UNIVERSITY, ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General, Sally Savage,
Senior Assistant,* and *Linda C. Krese* and *Paul Tanaka,*

*Assistants,* for appellants.

*Feltman, Gebhardt, Eymann & Jones, P.S.,* by *Richard C. Eymann, Steven L. Jones,* and *Robert F. Greer,* for respondent.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae for respondent.

DOLLIVER, J.—Defendants Washington State University (WSU), its Board of Regents and the Associated Students of WSU appeal from a judgment substantially against them in a personal injury action brought by plaintiff Kathleen Kirk. The plaintiff cross–appeals certain portions of the judgment. We affirm.

In the spring of 1978, Kathleen Kirk, a 20–year–old student at WSU, became a member of its cheerleading team, known as the WSU Yell Squad. The team received funding from both the athletic department and the Associated Students of WSU. The defendants conceded the team was a university–approved student activity. The cheerleaders performed other functions besides attending the games: they attended alumni functions, appeared at promotional functions and parades, and helped in fundraising for WSU. The team also practiced daily. The recruiters told the cheerleaders they "were in public relations."

The team had a faculty advisor, William Davis, from 1971 to 1978. Davis had actively supervised the team and emphasized safety. Sometime in the spring of 1978, Davis was transferred to a different position and replaced by another faculty member who did not attend the cheerleader practices.

In the fall of 1978, the team attempted to use the mat room, where they had practiced previously, but were told not to use that room. As a result, the team conducted its practices on the astroturf surface of Martin Stadium. Other faculty members were aware the astroturf was harder and caused more injuries than nonartificial turf. The cheer-

leaders were given no warning of the dangers of practicing on the astroturf.

Kirk was injured on October 18, 1978, during a cheerleading practice on the astroturf in preparation for an upcoming game. At the time she was injured the team was practicing shoulder stands. The end result of the maneuver was to have each female cheerleader standing on the shoulders of a male cheerleader. The method of reaching the stand had recently been modified in order to arrive at the completed stand more quickly. Teams in earlier years had performed the stand in the manner shown in pamphlets made available to them, the female placing one foot on the squatting male's upper leg, then one foot on his shoulder, then bringing the other foot up to his other shoulder. These pamphlets had not been made known to the 1978 team. In the modified version being used at the time of Kirk's injury, the female would stand behind the male, take his hands and "pop up", pulled up by the male, so both her feet landed on his shoulders at the same time. The male's hands would transfer immediately to the female's lower calves or ankles while she steadied herself.

Kirk's feet landed on the shoulders of the male cheerleader Mark Winger, but her body tipped backward. Winger had taken hold of her right above her ankles. Kirk stated she told him to let go, but he held her as she fell backward. She landed on the astroturf with her full weight on her left elbow, shattering all three bones in the elbow. Her left ankle was also fractured.

Shortly after Kirk's injury, WSU hired a new program supervisor with 10 years' experience in cheerleading to coach the team.

Kirk's injury to her elbow is permanent. She had surgery on the elbow due to the fractures, and one of the bones in the forearm is no longer connected to the joint. She will have continuing pain and arthritis in the area. She also became very depressed and suicidal after the injury and spent over a month in a psychiatric ward. There was some evidence Kirk had been depressed prior to the injury.

Kirk brought this action against WSU, its Board of Regents, and the Associated Students of WSU. The jury's verdict found the defendants had been negligent, and the negligence proximately caused Kirk's injuries and damages. The jury specifically found the defendants negligent for failure to provide adequate supervision, training, and coaching of the practices; failure to provide safety padding for the outdoor practices; failure to warn regarding the hardness of the astroturf surface; and failure to provide adequate literature regarding the proper and safe method of performing partner (double) stunts. The jury also found Kirk's own acts or omissions were the proximate cause of 27 percent of her injuries and reduced her damages by that amount. The total judgment for Kirk, including statutory fees and costs, was $353,791.

Both parties appeal various elements of the judgment, and this court granted direct review.

I

The defendants argue the trial court erred in refusing to adopt their proposed instructions regarding assumption of risk. They assert the assumption of risk doctrine should act as a complete bar to recovery and that the facts of this case present substantial evidence to support the proposed instructions to the jury on this issue.

The defendants' proposed instructions 12 and 13 read:

If plaintiff assumed the risk of harm from attempting to perform a shoulder stunt she may not recover damages for an injury resulting therefrom.

In order for plaintiff to have assumed such risk, she must have had actual knowledge of the particular danger and an appreciation of the risk involved and the magnitude thereof, and must thereafter have voluntarily assumed such risk.

For a person to act voluntarily he must have freedom of choice. This freedom of choice must come from circumstances that provide him a reasonable opportunity, without violating any legal or moral duty, to safely refuse to expose himself to the danger in question.

In determining whether the plaintiff assumed such

risk, you may consider her maturity, intelligence, experience and capacity, along with all the other surrounding circumstances as shown by the evidence.

The basis of assumption of risk is the plaintiff's consent to assume the risk and look out for herself. Therefore she will not be found, in the absence of an express agreement, to assume any risk unless she had knowledge of its potential danger and the risk is generally recognized as dangerous. This means that she must not only be aware of the facts that created the danger but also must appreciate the nature, character and extent which make it unreasonable. Thus even though the plaintiff might be aware of a potential danger arising from an activity she is engaged in it may appear to her to be so slight as to be negligible. In such a case the plaintiff does not assume the risk and it is not a proper defense to the action.

Kirk in a cross appeal contests instruction 6 given by the court which allowed the jury to reduce Kirk's damages for participating in the decision to perform the stunt in question, participating in the decision to practice on the astroturf, or "[v]oluntarily participating in an activity which she knew to be dangerous and in which she knew she could be hurt by falling."

The issues raised by the parties require this court to review the status of assumption of risk in Washington. The law in effect at the time of the events leading to this action was the 1973 comparative negligence statute, RCW 4.22-.010, Laws of 1973, 1st Ex. Sess., ch. 138, § 1, p. 949. The statute has since been superseded by the adoption of comparative fault in 1981. Laws of 1981, ch. 27.

The position of the assumption of the risk doctrine after the adoption of comparative negligence has been the subject of extensive discussion by various courts, including ours, as well as numerous commentators. *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 68 (5th ed. 1984); V. Schwartz, *Comparative Negligence* 153–80 (2d ed. 1986); 2 F. Harper & F. James, *Torts* 1162–92 (1956 & Supp. 1968); Annot., *Effect*

*of Adoption of Comparative Negligence Rules on Assumption of Risk,* 16 A.L.R.4th 700 (1982); *Shorter v. Drury,* 103 Wn.2d 645, 695 P.2d 116, *cert. denied,* 474 U.S. 827 (1985); *Lyons v. Redding Constr. Co.,* 83 Wn.2d 86, 515 P.2d 821 (1973). The commentators have agreed the general rubric "assumption of risk" has not signified a single doctrine but rather has been applied to a cluster of different concepts. *Tiller v. Atlantic Coast Line R.R. Co.,* 318 U.S. 54, 68, 87 L. Ed. 610, 63 S. Ct. 444, 143 A.L.R. 967 (1943) (Frankfurter, J., concurring); W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 496; F. Harper & F. James, at 1162. The commentators have identified and labeled four separate concepts to which "assumption of risk" has been applied in the past: express, implied primary, implied reasonable, and implied unreasonable. We recognized this classification scheme in *Shorter,* at 655, and will begin with this framework, as explained below, for our current discussion of these issues.

*Express* and *implied primary* assumption of risk arise where a plaintiff has consented to relieve the defendant of a duty to the plaintiff regarding specific known risks. Where express assumption of risk occurs, the plaintiff's consent is manifested by an affirmatively demonstrated, and presumably bargained upon, express agreement. Implied primary assumption of risk is similarly based on consent by the plaintiff, but without "the additional ceremonial and evidentiary weight of an express agreement". W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 496. The elements of proof are the same for both. The evidence must show the plaintiff (1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk. W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 487; F. Harper & F. James, at 1162–65; Restatement (Second) of Torts § 496C(1) (1965); *Shorter,* at 651–52 (applying these elements in express assumption of the risk context). The basis of these two types of assumption of risk is the plaintiff's consent to the negation of a duty by the defendant with regard to those risks

assumed by the plaintiff. F. Harper & F. James, at 1165; W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 496. We have already held these two forms of assumption of risk are not identical to contributory negligence and may still warrant reduction of the plaintiff's damages to the extent those damages resulted from the risks assumed. *Shorter v. Drury, supra* (upholding jury award of damages and reduction of award by 75 percent, the portion of the injury caused by risks expressly assumed by the plaintiff).

*Implied unreasonable* assumption of risk, by contrast, focuses not so much upon the duty and negligence of the defendant as upon the further issue of the objective unreasonableness of the plaintiff's conduct in assuming the risk. This form of assumption of risk is widely recognized as a form of contributory negligence. We have earlier concluded implied unreasonable assumption of risk is subsumed under contributory negligence and should be treated equivalently. *Shorter,* at 654–55; *Lyons,* at 96.

*Implied reasonable* assumption of risk has provided the most difficulty for the courts and commentators in this area. It is roughly the counterpart to implied unreasonable assumption of risk—the plaintiff assumed a risk, but acted reasonably in doing so. Courts and commentators have differed on how to treat this type of assumption of risk, and our earlier opinions have left undecided the status of implied reasonable assumption of risk after the adoption of comparative negligence. *Shorter,* at 655.

■ With this basic understanding of the existing law of assumption of risk, we turn to the arguments of the parties in this case. The defendants contend they were entitled to have the jury instructed on assumption of risk as a complete bar to any recovery by the plaintiff because the injury occurred during the plaintiff's participation in an athletic activity. We disagree. The appellant misinterprets the nature of the assumption of the risk concept and our earlier opinions on the subject. Assumption of the risk may act to limit recovery but only to the extent the plaintiff's damages resulted from the specific risks known to the plaintiff and

voluntarily encountered. To the extent a plaintiff's injuries resulted from other risks, created by the defendant, the defendant remains liable for that portion.

The use of assumption of risk in this manner can be seen in *Shorter v. Drury, supra.* The court in *Shorter* did not allow express or implied primary assumption of risk to act as a complete bar to recovery by the plaintiff where the defendant's negligence was also a cause of the damages to the plaintiff. *Shorter,* at 657. The court instead treated the assumption of the risk as a damage–reducing factor, attributing a portion of the causation to the plaintiff's assumption of the risk and a portion to the defendant's negligence.

In *Shorter,* a woman had in writing expressly assumed the risk of her refusal, on religious grounds, to accept any blood transfusions during a medical procedure involving the risk of bleeding even if performed without negligence by the doctor. The doctor did, however, negligently lacerate her during the procedure. She continued to refuse transfusions and bled to death. The trial court instructed the jury:

> If you find that Mr. or Mrs. Shorter assumed a risk which was a proximate cause of Mrs. Shorter's death, you must determine the degree of such conduct, expressed as a percentage, attributable to Mr. and Mrs. Shorter. . . . Using 100% as to the total combined conduct of the parties (negligence and assumption of the risk) which contributed to the damage to the plaintiff, you must determine what percentage of such conduct is attributable to Mr. or Mrs. Shorter.

*Shorter,* at 653–54. Thus, the *Shorter* court treated the plaintiff's assumption of the risk as a damage–reducing factor rather than a complete bar in cases where the defendant's negligence caused some portion of the plaintiff's damages. *See also Lyons,* at 96 ("the calculus of balancing the relative measurements of fault inevitably incorporates the degree to which the plaintiff assumed the risk").

We find support for this approach to the issue of assumption of risk in the language of Professor Schwartz:

> A rigorous application of implied assumption of risk as an absolute defense could serve to undermine seriously

the general purpose of a comparative negligence statute to apportion damages on the basis of fault. This is perhaps the reason that every commentator who has addressed himself to this specific problem has agreed that plaintiff should not have his claim barred if he has impliedly assumed the risk, but rather that this conduct should be considered in apportioning damages under the statute.

(Footnotes omitted.) V. Schwartz, *Comparative Negligence* § 9.5, at 180 (2d ed. 1986). He notes only one jurisdiction "vigorously applies" assumption of risk as an absolute defense after the adoption of comparative negligence. V. Schwartz, at 180 n.78.

We also find support for our position in the opinions of numerous courts, including our own, holding a plaintiff's assumption of certain known risks in a sport or recreational activity does not preclude recovery for injuries resulting from risks not known or not voluntarily encountered. *Regan v. Seattle,* 76 Wn.2d 501, 458 P.2d 12 (1969) (driver of "go-cart" on race course does not assume unknown risk of spilled water on the course); *Wood v. Postelthwaite,* 6 Wn. App. 885, 496 P.2d 988 (1972) (golfer does not assume unknown, unforeseen risk of being hit by golf ball due to inadequate warning but may assume other known risks inherent in the game), *aff'd,* 82 Wn.2d 387, 510 P.2d 1109 (1973); *Miller v. United States,* 597 F.2d 614 (7th Cir. 1979) (swimmer in public lake did not assume risk of diving off pier into too shallow water); *Segoviano v. Housing Auth.,* 143 Cal. App. 3d 162, 191 Cal. Rptr. 578 (1983) (participant in recreational flag football game did not voluntarily assume risk for injuries inflicted by another player in violation of the rules); *Leahy v. School Bd.,* 450 So. 2d 883 (Fla. Dist. Ct. App. 1984) (high school football player injured during a drill did not assume risks of improper supervision and inadequate safety equipment); *Rieger v. Zackoski,* 321 N.W.2d 16 (Minn. 1982) (spectator who walked onto raceway after auto race did not assume all risks of unauthorized vehicles racing around the track; defendant 32 percent negligent); *Shurley v. Hoskins,* 271

So. 2d 439 (Miss. 1973) (hunter did not assume risk of being negligently shot by companion); *Meistrich v. Casino Arena Attractions, Inc.,* 31 N.J. 44, 155 A.2d 90, 82 A.L.R.2d 1208 (1959) (skater did not assume risks of unusually hard and slippery ice at defendant's rink, even though known); *Rutter v. Northeastern Beaver Cy. Sch. Dist.,* 496 Pa. 590, 437 A.2d 1198 (1981) (high school football player did not voluntarily assume all risks of playing "jungle" football at coaches' request without equipment); *Meese v. Brigham Young Univ.,* 639 P.2d 720 (Utah 1981) (student beginner skier did not assume unknown risk of improperly adjusted bindings fitted by defendant; defendant 75 percent responsible for plaintiff's injuries); *Sunday v. Stratton Corp.,* 136 Vt. 293, 390 A.2d 398 (1978) (skier did not assume unknown risk of becoming entangled in brush concealed by the snow).

In the present case, the trial court did not err in rejecting proposed instructions regarding assumption of the risk as a complete bar to recovery. Although express and implied primary assumption of the risk remain valid defenses, they do not provide the total defense claimed by the defendant. Implied unreasonable assumption of the risk has never been considered a total bar to recovery in comparative negligence jurisdictions.

Kirk in her cross appeal argues the trial court erred in allowing the jury to consider assumption of the risk in any manner, even as a damage–reducing factor. Kirk argues even if she did assume certain risks that contributed to her injuries, her conduct in doing so was reasonable and should not be used to reduce her damages. This contention requires us to determine the status of implied reasonable assumption of the risk, the last remaining category. Its status had been left undecided by our earlier opinions.

One commentator has proposed implied reasonable assumption of risk should not be allowed to reduce a plaintiff's damages in any way. W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 497–98. There are several weaknesses in this approach, however, which lead us not to adopt it. First,

Professor Keeton proposed this treatment of implied reasonable assumption of risk in part to counter the harsh effects of the absolute bar to recovery approach for express and implied primary assumption of risk. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, at 497 (proposed approach prevents implied reasonable assumption of risk from acting as "an *absolute bar*" (italics ours)). Since we have not adopted that harsh approach, we see no reason to adopt this exception to it. Second, other commentators have not favored providing special treatment for this rather elusively defined category. *See* V. Schwartz, at 156–57, 180; Restatement (Second) of Torts § 496C, comment *g*, at 572 (1965). We favor the reasoning of Professor Schwartz allowing implied reasonable assumption of risk to be given to the jury as a factor for consideration:

> The reasoning . . . that *reasonable* implied assumption of risk should not serve to diminish the amount of plaintiff's recovery . . . is seriously flawed. When a person's conduct under the facts is truly voluntary and when he knows of the specific risk he is to encounter, this is a form of responsibility or fault that the jury should evaluate. Those who argue that the "jury cannot do this" have not met too many jurors. . . . When a plaintiff engages in classic assumption of risk conduct, he is *in part* responsible for his injury.

(Footnote omitted.) V. Schwartz, at 180. We do note this form of assumption of the risk is still subject to the voluntariness element assumption of the risk; even though the plaintiff's conduct may be reasonable it must still be shown to be *voluntary* in order to warrant an instruction of assumption of the risk. *See Segoviano v. Housing Auth.*, 143 Cal. App. 3d 162, 174, 191 Cal. Rptr. 578, 587 (1983) ("[u]nless the plaintiff has reasonable alternatives available to him, he cannot be said to have voluntarily assumed the risk").

The trial court below therefore did not err in allowing the jury to consider the conduct of the plaintiff, including implied reasonable assumption of risk, in reaching its findings reducing the damages.

## II

The defendants also argue the trial court erred in allowing Kirk's economic expert Clarence Barnes to testify regarding Kirk's future potential wage loss assuming she were only able to work 25 hours per week instead of full time. The defendants argue the testimony was unsupported by evidence.

■ ER 702 permits an expert witness to testify in the form of an opinion, and ER 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The standard of review is whether the trial court abused its discretion in admitting the testimony. *Gerberg v. Crosby*, 52 Wn.2d 792, 799, 329 P.2d 184 (1958).

Barnes testified Kirk would lose wages of $186,580 if she could only work 25 hours per week. In addition to the evidence regarding Kirk's permanent disability and continuing pain, other testimony more directly indicated Kirk had and would continue to have difficulty working, or working full days, due to the injury or her depression. Barnes stated he had based his calculations on information from Dennis Pollack, a clinical psychologist, indicating some concern about Kirk's ability to maintain full-time employment. Barnes did not present the 25-hour week as the only possible future scenario for Kirk. It is not clear from the testimony whether Barnes testified it was the most likely scenario. The record contained sufficient evidence providing a basis for Barnes' testimony, and the trial court did not abuse its discretion in allowing the testimony.

## III

The trial court gave an instruction to the jury allowing it to consider as one of the possible elements of damage to Kirk "[t]he reasonable value of the lost opportunity or loss

of a chance to become a professional dance performer." The defendants contend this is not a proper separate element of damages, but is already included within the damages for pain and suffering, and disability and disfigurement. The defendants argue a separate instruction on it allowed the possibility of a double recovery. Kirk responds there was no error in giving the instruction or any error was harmless, and alternatively argues in the cross appeal if the trial court did err in giving the instruction, then it also erred in not instructing the jury to consider loss of enjoyment of life with regard to Kirk's inability to continue dancing.

We first note both parties intended and assumed this instruction would act as an equivalent of a "loss of enjoyment" instruction. Apparently Kirk originally proposed a loss of enjoyment of life instruction, but the trial judge proposed and the parties accepted the language used as a functional equivalent. The issue appealed in both the appeal and the cross appeal, therefore, is whether a loss of enjoyment instruction is proper, or improperly allows the possibility of double recovery.

The general test for reviewing jury instructions is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not misleading, and properly inform the trier of fact of the applicable law. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). The defendant cites two cases, *Wooldridge v. Woolett,* 96 Wn.2d 659, 638 P.2d 566 (1981) and *Blodgett v. Olympic Sav. & Loan Ass'n,* 32 Wn. App. 116, 646 P.2d 139 (1982), to support its proposition the loss of enjoyment of life is not an appropriate element for a separate damage instruction. The Court of Appeals in *Blodgett,* a personal injury action, held recovery for loss or impairment of the capacity to enjoy life is duplicative of recovery for physical and mental disability. *Blodgett,* at 124–25. *Blodgett,* however, misinterpreted the authority it cited to support this proposition. *Blodgett* relied upon *Wooldridge,* which involved a survival action under RCW 4.20.046. The *Wooldridge* court held an instruction allowing recovery for loss

of ability to enjoy the pleasures of life was a component of the pain and suffering expressly barred from recovery by the language of the survival statute. *Wooldridge,* at 664–67. *Wooldridge* does not support a conclusion that an instruction regarding enjoyment of life would be barred in a personal injury action not governed by the survival statute. In fact, the *Wooldridge* court did not criticize the argument made by the appellant in that case, relying on *Reed v. Jamieson Inv. Co.,* 168 Wash. 111, 10 P.2d 977, 15 P.2d 1119 (1932) and *Parris v. Johnson,* 3 Wn. App. 853, 479 P.2d 91 (1970), that a qualitative loss of life's pleasures is a separate element of damages apart from pain and suffering. The *Wooldridge* court merely distinguished those cases as involving personal injury actions instead of survival actions. *Wooldridge,* at 664.

Kirk also argues damages for loss of enjoyment here simply are not duplicative of any of the other types of recovery available. Recovery for pain and suffering only compensates for physical and mental discomfort caused by the injury. *Thompson v. National R.R. Passenger Corp.,* 621 F.2d 814 (6th Cir.), *cert. denied,* 449 U.S. 1035 (1980). Recovery for disability compensates for inability to lead a "normal life" but does not imply any recovery for loss of a specific unusual activity such as ballet dancing. Other jurisdictions have allowed recovery for loss of specific artistic or athletic skills. *See, e.g., Sutherland v. Auch Inter–Borough Transit Co.,* 366 F. Supp. 127 (E.D. Pa. 1973); *Thompson v. Tartler,* 166 Colo. 247, 443 P.2d 365 (1968); *Locicero v. State Farm Mut. Ins. Co.,* 399 So. 2d 712 (La. Ct. App. 1981); *Grayson v. Irvmar Realty Corp.,* 7 A.D.2d 436, 184 N.Y.S.2d 33 (1959). Recovery for lost wages or lost earning capacity compensates for economic value, but does not include the noneconomic rewards to the dancer.

The trial court in the present case may have felt the need to alert the jury of its prerogative to include consideration of Kirk's loss of enjoyment of life based upon her inability to pursue her interests and abilities in ballet. The trial court's method of instruction, while perhaps not beyond

improvement, does not appear to have misled the jury or to have fostered a double recovery.

## IV

The defendants challenge the trial court's ruling in limine prohibiting any specific reference to the plaintiff's abortions, the latest of which occurred several months before her injury. The trial court ruled the prejudicial effect of this evidence far exceeded its value. We agree.

Under ER 403, the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The weighing of probative value against unfair prejudice under this rule rests within the sound discretion of the trial court. *State v. Mak,* 105 Wn.2d 692, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986).

We find no abuse of discretion. The prejudicial nature of this evidence is beyond question. The judge particularly noted the attitudes of the community regarding abortions influenced his decision to exclude the evidence. The relevance of the evidence to the facts in issue is tenuous. Defendants argue the abortions were relevant to the plaintiff's mental state before the injury, which in turn relates to whether her depression was caused by the injury or predated it. However, the defendants offered no significant evidence to support the asserted link between the abortions and her mental state. Dr. J. Clifford Green, the psychiatric expert witness for the defense, when asked at a deposition if he had an opinion whether the abortions were a factor in the depression, replied:

> I'd be hard pressed for that. Some people, that bothers a lot and some people it doesn't. I don't recall [us] spending any significant amount of time talking about that. I think if we'd have spent a lot of time talking about it, I'd have reference to it.

Similarly, the psychiatrist for the plaintiff, Dr. Thomas G. Schemmel, stated it was hypothetically "within the realm of possibility" that abortions could be a contributing factor

to some depression, but Kirk herself "did not reveal any evidence of turmoil or discomfort" regarding the procedures. These statements do not indicate sufficient relevance to any preinjury depression to outweigh the prejudicial nature of the evidence.

The defendants further contended at oral argument that the following interchange at trial during the plaintiff's direct examination prejudiced the defense on this issue:

Q: [Did] anything happen in your life . . . of a major note while you were going to school beginning in 1977 and going into 1978 . . . which altered, let's say, your dance career?
A: No.
Q: Okay.
Q: Anything that would have made you depressed?
A: No.

In the absence of any specific testimony from the expert witnesses or elsewhere that the abortions themselves contributed to Kirk's depression, we find no prejudice to the defendants from this interchange which would have necessitated admission of the evidence of the abortions. The defendants were not prohibited from introducing other evidence to indicate Kirk's depression predated her injury, and they did so on several occasions. The availability of other means of proof is an appropriate factor for consideration in deciding whether to exclude evidence on grounds of unfair prejudice. Comment, ER 403.

We also note the case law under the identical federal rule, Fed. R. Evid. 403, has discouraged the admission of the prior sexual history of civil plaintiffs in light of its highly prejudicial nature. *In re Air Crash Disaster Near New Orleans,* 767 F.2d 1151, 1154 (5th Cir. 1985) (plaintiff sued for wrongful death of his wife and children; no abuse of discretion in refusing to admit evidence of his contraction of venereal disease during the course of the marriage); *Cohn v. Papke,* 655 F.2d 191, 194 (9th Cir. 1981) (plaintiff sued police officers who had arrested him for solicitation to engage in a homosexual act; trial court abused its discretion

in admitting evidence of plaintiff's past sexual experiences; "[t]here was a clear potential that the jury may have been unfairly influenced by whatever biases and stereotypes they might hold"); *Kilarjian v. Horvath*, 379 F.2d 547, 548 (2d Cir. 1967) (plaintiff suing for injuries; no abuse of discretion in refusing to admit evidence including psychiatric report to support defense theory the plaintiff was suffering from a "conversion reaction" caused by his "separation from his wife . . . and his frustrated desire to marry his secretary with whom he had meanwhile been living").

We find no abuse of discretion in the trial court's exclusion of the unfairly prejudicial evidence regarding the plaintiff's prior abortions.

## V

The defendants contend this court has power to review the amount of the verdict and should reduce the award as so unrealistic as to shock the conscience.

This contention is without merit. The determination of the amount of damages is primarily and peculiarly within the province of the jury, and an appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have resulted from passion or prejudice. *Bingaman v. Grays Harbor Comm'ty Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985). There is simply no evidence of passion or prejudice here, nor does an award of $353,791 for Kirk's injuries, including pain and suffering, depression, and permanent partial disability in her arm indicate anything to shock the conscience. We hold the trial judge properly refused the defendants' motion for a new trial based on the amount of the damages award.

The judgment of the trial court is affirmed.

PEARSON, C.J., and UTTER, BRACHTENBACH, ANDERSEN, CALLOW, and DURHAM, JJ., concur.

GOODLOE, J. (dissenting)—I dissent from the majority opinion which holds that the trial judge did not abuse his discretion in granting Kirk's motion in limine excluding all testimony of her three abortions. Kirk's depression was a major element in the amount of damages awarded to her. The fact that she was depressed before the accident may well have been in part or all on account of the abortions. Therefore, the relevance of the abortion evidence is a question of fact that should have been given to the jury in their deliberations.

ER 403 reads in part: "Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of *unfair prejudice*". (Italics mine.) I disagree with the majority that "[t]he relevance of the [abortion] evidence to the facts in issue is tenuous." Majority opinion, at 462. Rather, I believe that the evidence is probative and that the jury should have had the evidence before it in determining the emotional damages suffered by Kirk caused by her depression.

ER 403 sets forth a balancing test. For the trial court to exclude evidence its probative value must be substantially outweighed by the danger of unfair prejudice. Any unfair prejudice to Kirk does not outweigh its probative value. The majority cites three federal cases that discouraged the admission of the prior sexual history of civil plaintiffs in light of its highly prejudicial nature. However, in each of these cases, the sexual history of the plaintiff had no relevance to the suit before the court.

The first case involved admitting evidence that the plaintiff had contracted venereal disease during the course of his marriage. *In re Air Crash Disaster Near New Orleans*, 767 F.2d 1151 (5th Cir. 1985). The cause of action was for wrongful death of plaintiff's wife and children when an airplane crashed into and completely destroyed the family home. The court in *In re Air Crash* correctly decided that evidence of plaintiff's venereal disease was not relevant to his emotional state, especially since he admitted on the stand that he had been unfaithful to his wife during

the marriage.

The second case involved a suit for injuries received in an automobile accident. The contested evidence was the theory that plaintiff's depression was the result of a "conversion reaction" caused by plaintiff's separation from his wife and that he wished to marry his secretary with whom he had meanwhile been living. *Kilarjian v. Horvath,* 379 F.2d 547 (2d Cir. 1967). The court only refused to admit the evidence that plaintiff had been living with his secretary and that he wished to marry her. The defendant was free to admit the evidence of plaintiff's separation from his family and other emotional problems. The prejudice of the evidence involving his secretary substantially outweighed its probative value since it had no relevance.

The third case involved evidence of the plaintiff's bisexuality or homosexuality after he had been arrested for solicitation to engage in a homosexual act. *Cohn v. Papke,* 655 F.2d 191 (9th Cir. 1981). The court correctly decided that the fact the plaintiff is bisexual or homosexual has no relevance whether he would solicit someone to engage in a sexual act. Also, it stands to reason just because someone is heterosexual is no indication that he or she will solicit a sexual encounter with someone of the opposite sex. The excluded evidence had no probative value.

Kirk is distinguished from all three cases in that the excluded evidence was probative information so, although prejudicial, its prejudicial nature in no way substantially outweighs its probativeness. The trial judge abused his discretion when he granted Kirk's motion in limine excluding such probative evidence. I would remand to the trial court on the issue of damages.

DORE, J., concurs with GOODLOE, J.