## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| JOHN AND LORI EDWARDS, a marital community, | ) ) ) | No. 34449-5-III |
| | ) | |
| Appellants. | ) ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| COLVILLE MOTOR SPORTS, INC., a Washington corporation; JOHN DOE and JANE DOE, a marital community, | ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — John Edwards and Lori Edwards appeal from a defense judgment following a jury trial. They assert they are entitled to a new trial based on various trial court errors. We agree that the trial court erred when it instructed the jury on implied assumption of risk and when it dismissed the Edwardses' general negligence claim. We therefore reverse the judgment and remand for a new trial.

## FACTS

In December 2010, Mr. Edwards bought an all-terrain vehicle (ATV) from Colville Motor Sports, Inc. (CMS). At the time of purchase, Mr. Edwards received a

Polaris owner's manual, contract paperwork, and an operational video, which was essentially the owner's manual in video form. Mr. Edwards read and signed a document that stated:

> "Hill climbing is dangerous and should be attempted only by experienced operators. Start on shallow slopes and practice procedures described in the owner's manual before trying steeper terrain. Some hills are too steep to safely stop or recover from and [sic] unsuccessful climbing attempt. If the vehicle slides backwards downhill, apply brakes with gradual even pressure to avoid flip over."

Report of Proceedings (RP) at 500.

Mr. Edwards had never ridden an ATV before. Mr. and Ms. Edwards read the owner's manual and watched the operational video together. The manual instructed that failure to heed its warnings and safety precautions could "result in severe injury or death." Ex. 42 at 5. It also warned that "[a] collision or rollover [could] occur quickly, even during routine maneuvers like turning, or driving on hills or over obstacles, if [the rider] fail[ed] to take proper precautions." Ex. 42 at 5.

The owner's manual also contained specific instructions regarding driving uphill. It instructed the rider to "[p]roceed at a steady rate of speed and throttle opening." Ex. 42 at 51. It cautioned that "[o]pening the throttle suddenly could cause the ATV to flip over backwards." Ex. 42 at 51. It further warned that "[o]perating on excessively steep hills

2

could cause an overturn," and instructed the rider to "[n]ever operate the ATV on hills steeper than 25 degrees." Ex. 42 at 16.

The owner's manual also contained instructions for the rider if the ATV stalled while climbing a hill. If the ATV lost forward speed or began rolling downhill, the manual instructed riders to keep their body weight uphill, apply the brakes, and "[n]ever apply engine power." Ex. 42 at 16. The manual warned that stalling or rolling backwards while climbing a hill could cause an overturn. Mr. Edwards understood these instructions.

A CMS employee delivered the ATV to the Edwardses' home and unloaded it. Mr. Edwards noticed the deliveryperson used a ramp to unload the ATV, so he went and bought six-foot ramps for loading and unloading the ATV in the future. Mr. Edwards drove the ATV four or five times throughout the next few months, mainly to ride to and from the mailbox at the end of his driveway.

In mid-May 2011, Mr. Edwards took the ATV to CMS for its first scheduled maintenance. At home, without assistance, Mr. Edwards attached the loading ramps to the tailgate of his full-size pickup truck. He did this on a level surface. He then drove the ATV into the bed of his truck without difficulty. This was the first time he had ever

3

loaded the ATV. He drove his truck to CMS where an unknown employee unloaded the ATV for him.

About two weeks later, CMS called Mr. Edwards and told him the ATV was ready. On May 31, on their way home from a fishing trip, Mr. and Ms. Edwards decided to pick up the ATV.

CMS sat on a hillside. Its parking lot sloped downhill and away from the building. There was no level spot in the parking lot. Yellow lines marked parking spaces, which faced the building at an angle. There were no warning signs about the slope or how to load ATVs. CMS did not have a loading dock.

Mr. Edwards parked his truck in one of the marked spots in front of CMS, with his truck facing uphill toward the building. Mr. Edwards went inside and paid the bill. He walked back out to his truck, removed the ramps from the bed, and began getting them ready.

A CMS shop assistant, William Harris, drove the Edwardses' ATV out from the shop and parked it two or three feet behind Mr. Edwards' truck. Mr. Harris helped Mr. Edwards finish attaching the ramps to the truck's tailgate.

Mr. Edwards assumed a CMS employee would load the ATV into his truck. Both customers and CMS employees would regularly load ATVs into trucks just outside the

4

door of the building. The majority of customers who brought their ATVs in for maintenance would unload the ATVs themselves. However, an experienced CMS employee would load the ATV if asked, and it was up to the customers whether they wanted to load their ATVs themselves.

As Mr. Harris helped Mr. Edwards attach the ramps to the tailgate, Ms. Edwards said, "'Hon, this doesn't look safe.'" RP at 463. Mr. Edwards agreed. Ms. Edwards expressed her concerns to Mr. Harris and asked Mr. Harris if he would load the ATV into the truck.[1] Mr. Harris responded that he was uncomfortable doing so because he did not have much experience with ATVs. Typically, when Mr. Harris was uncomfortable loading an ATV, he would go get a more experienced employee to load it. Mr. Harris did not offer to go inside to get someone more experienced to load the ATV, nor did Mr. Edwards ask him to do so.

Mr. Edwards recognized that the parking lot was "[c]learly" sloped. RP at 518. Because of the slope, the Edwardses asked Mr. Harris if they should turn the truck around so it would face downhill and away from the building, thus decreasing the angle of the

---

[1] The parties dispute certain aspects of these discussions. These discussions are germane to the Edwardes' general negligence claim, which was dismissed by the trial court as a matter of law. Because our review of that ruling requires us to consider these facts in the light most favorable to the Edwardses, we set forth these facts favorably to the Edwardses for purposes of our review.

5

ramps. Mr. Harris responded, "'No, we do it right here all the time,'" and also stated that he did not think "it makes much difference." RP at 185, 362.

Mr. Edwards got on the ATV and sat in the middle of the seat. Ms. Edwards and Mr. Harris stood to the side of the truck. Mr. Edwards was not wearing a helmet, although he had one at home, and CMS had some inside. He did not ask to borrow one, nor did Mr. Harris offer one. Mr. Edwards began driving up the ramp.

Mr. Edwards did not start out with enough speed and began losing momentum as the front tires reached the tailgate. As the ATV came to a stop, Mr. Edwards hit the throttle. This caused the front of the ATV to pop up and caused the ATV's center of gravity to shift behind the rear wheels. When this happened, the ATV flipped backward and landed on top of Mr. Edwards.

Mr. Harris pulled the ATV off Mr. Edwards. Paramedics arrived and Mr. Edwards was flown by helicopter to a hospital. The ATV had broken his eye socket, shoulder, and several ribs. It also shattered his jaw, punctured his lung, and penetrated his cheek and neck. Hospital staff put Mr. Edwards into a medically-induced coma for five days. He underwent 11 surgical procedures and incurred roughly $349,000 in medical expenses. He continues to have problems swallowing, speaking, eating, and drinking.

6

PROCEDURE

The Edwardses filed suit, naming CMS, John Doe, and Jane Doe as defendants.[2] They asserted claims of general negligence and premises liability.

Before trial, the Edwardses moved to exclude any evidence that Mr. Edwards was not wearing a helmet when the accident occurred. They argued this evidence was irrelevant to the issue of comparative negligence because Mr. Edwards's failure to wear a helmet did not cause the ATV to flip over. They also argued this evidence was irrelevant to Mr. Edwards's failure to mitigate damages, given that CMS had not presented any expert evidence showing that a helmet would have prevented some of Mr. Edwards's injuries.

The trial court granted the Edwardses' motion to exclude any helmet evidence as it related to the issue of factual causation. However, the trial court denied the motion as it related to the issue of damages, provided that CMS could show the absence of a helmet resulted in Mr. Edwards sustaining more severe injuries than he would have otherwise. The Edwardses requested permission to voir dire any experts to determine if they had sufficient medical training to opine on whether a helmet could have prevented Mr. Edwards's injuries. CMS argued that expert medical testimony was unnecessary, and that

---

[2] John Doe was later determined to be Mr. Harris.

7

it would be obvious for the jury that a helmet could have prevented some injuries. The trial court reserved ruling on the issue until it became ripe during the trial.

In its opening statement, CMS told the jury that Mr. Edwards was not wearing a helmet when the accident occurred, noted that Mr. Edwards's helmet had a faceguard, and asserted that a helmet would have protected him from some of the injuries. CMS further told the jury that Mr. Edwards did not ask CMS for a helmet, but rather chose not to wear one.

The Edwardses first called Ms. Edwards. On direct examination, plaintiffs' counsel asked Ms. Edwards if anyone at CMS had offered to obtain a helmet, and Ms. Edwards responded that no one had. Plaintiffs' counsel then asked if Mr. Harris had worn a helmet when he drove the ATV out from the shop, and Ms. Edwards testified that he had not.

On cross-examination, defense counsel asked Ms. Edwards if she and Mr. Edwards owned a helmet, and if they had it with them when they went to pick up the ATV. Ms. Edwards responded that they owned one, but did not bring it with them. Defense counsel asked if it was a full-face helmet that covered the wearer's neck and chin. Ms. Edwards testified it was. Defense counsel then asked where the ATV injured Mr. Edwards. Ms. Edwards testified the ATV injured his cheek and jaw area. Defense

8

counsel asked Ms. Edwards if her husband had instructed her to wear a helmet when she rode the ATV, and Ms. Edwards testified that he did.

The Edwardses called a forensic engineer, Dr. William Skelton. Dr. Skelton had evaluated CMS's parking lot, measured its slope, and measured the slope of the ramps while they were attached to Mr. Edwards's truck in the parking lot. Dr. Skelton testified that when Mr. Edwards's truck was parked facing uphill toward the building, the ramps had a slope of 35 degrees. He testified that when Mr. Edwards's truck was parked facing downhill away from the building, the ramps had a slope of 26 degrees.

Dr. Skelton opined that based on his experience and investigation, CMS's parking lot was not reasonably safe for an inexperienced rider to load an ATV using 6-foot ramps. However, he testified that a rider could safely load an ATV on a slope of 35 degrees, if the rider had enough experience. He further testified that an ATV parked a few feet from the ramp would not gain enough momentum to carry it over the ramps and into the pickup, but that an ATV starting from 15 to 20 feet back would.

On direct examination, plaintiffs' counsel also questioned Dr. Skelton as to whether Mr. Edwards's injuries would have been lesser if Mr. Edwards had worn a helmet. Dr. Skelton responded that he was not a biomechanical engineer or a medical doctor and was thus unqualified to opine on that subject. However, he also remarked that

a helmet would not have prevented the handlebar from penetrating Mr. Edwards's cheek, unless it was a full-face helmet.

On cross-examination, defense counsel asked Dr. Skelton whether a full-face helmet would have prevented Mr. Edwards's injuries. Dr. Skelton responded that a full-face helmet could have deflected the ATV's handlebar.

The Edwardses' last witness was Mr. Edwards. On cross-examination, defense counsel asked Mr. Edwards whether his helmet was a full-face helmet, and Mr. Edwards testified it was. He further testified that in May 2011, he owned a "modular" helmet that covered his cheeks and jawline. RP at 515. Defense counsel asked Mr. Edwards why he did not have his helmet with him when he went to pick up the ATV. Mr. Edwards testified that he and his wife spontaneously decided to pick up the ATV on the way back from a fishing trip. Finally, defense counsel asked whether Mr. Edwards asked to borrow a helmet. Mr. Edwards testified that he did not ask, but no one offered one, either.

During the jury instruction conference, CMS proposed instructing the jury on implied primary assumption of risk. The Edwardses objected and proposed only instructing the jury on contributory negligence. The court instructed the jury on assumption of risk and contributory negligence. The court's assumption of risk

10

instruction modified the Washington pattern instruction by adding a sentence at the end of the instruction. The modified instruction read:

> It is a defense to an action for personal injury that the person injured impliedly assumed a specific risk of harm.
>
> A person impliedly assumes a risk of harm if that person knows of the specific risk associated with a course of conduct, understands its nature, and voluntarily consents to accept the risk by engaging in that conduct, and impliedly consents to relieve the defendant of a duty of care owed to the person in relation to the specific risk.
>
> A person's acceptance of risk is not voluntary if that person is left with no reasonable alternative course of conduct to avoid the harm because of defendant's negligence.
>
> A person's implied assumption of a specific risk is not knowing if you find the person was given misleading information or a misleading assurance of safety.

CP at 349.

After both parties rested, CMS moved to dismiss the Edwardses' general negligence claim as a matter of law. It argued that it only owed Mr. Edwards a duty as the owner and operator of the premises, and that it did not owe him a separate general duty of care. It argued its premises liability duty also encompassed Mr. Harris's actions. The Edwardses disagreed, arguing Mr. Harris had a separate duty not to give Mr. Edwards misleading instructions or false assurances of safety. They argued Mr. Harris's actions supported a general negligence claim separate and apart from their premises

11

liability claim, which focused on the dangerous conditions of the land. The court agreed with CMS and dismissed the Edwardses' general negligence claim.

The jury found that CMS breached its duty to the Edwardses and that CMS's negligence proximately caused Mr. Edwards's injuries. However, the jury also found that Mr. Edwards impliedly assumed the risk. The Edwardses asked the trial court to poll the jury, and the court did so. The Edwardses did not object to any inconsistency in the jury's verdict.

The Edwardses moved under CR 59 for a new trial on damages. They argued that (1) CMS violated the trial court's order in limine regarding the helmet evidence, (2) the trial court erred in dismissing their general negligence claim as a matter of law, (3) the trial court erred in instructing the jury on implied primary assumption of risk, and (4) the jury's responses on the special verdict form were inconsistent.

As to the helmet evidence, the trial court ruled that, apart from CMS's remarks in its opening statement, the Edwardses opened the door to this evidence by questioning their witnesses about the helmet on direct examination. The trial court also ruled that CMS adequately demonstrated the relationship between the absence of a helmet and Mr. Edwards's injuries, and that this link was within the experience and observation of ordinary laypeople.

12

The trial court further ruled that it properly dismissed the Edwardses' general negligence claim. The court found that CMS did not have a general duty to protect Mr. Edwards or give accurate advice, and that its only duty arose out of its ownership and operation of the premises. The court also ruled that the jury's finding of implied primary assumption of risk negated any duty.

The trial court also concluded it properly instructed the jury on implied primary assumption of risk. It ruled that Mr. Edwards had a full subjective understanding of the specific risk—the steep ramp, the slope of the parking lot, and Mr. Harris's statements—yet nevertheless voluntarily chose to encounter it.

Finally, the trial court determined the jury's verdict was consistent. The court reasoned that the jury's findings on negligence and proximate cause focused on CMS's actions, but that its findings on assumption of risk focused on Mr. Edwards's actions. The trial court denied the Edwardses' motion for a new trial on damages.

In light of the jury's finding that Mr. Edwards had impliedly assumed the risk, the trial court entered judgment in favor of CMS. The Edwardses appeal.

On appeal, the Edwardses argue the trial court erred in four respects: (1) by instructing the jury on implied primary assumption of risk, (2) by directing a verdict dismissing their general negligence claim, (3) by allowing CMS to violate the order in

13

limine excluding evidence that Mr. Edwards did not use a helmet, and (4) by giving an inconsistent and confusing special verdict form. We agree with the Edwardses' first two arguments, determine that they are entitled to a new trial on both of their claims and decline to address the latter two issues as moot.

## ANALYSIS

### 1. ASSUMPTION OF RISK

The Edwardses argue that the trial court erred in instructing the jury on implied primary assumption of risk, which acted as a complete bar to recovery. They argue that CMS's sloped lot, Mr. Harris's placement of the ATV within two or three feet of the ramps, and Mr. Harris's assurances, all increased the risk inherent in loading an ATV into a truck. And because the defendants' positive actions increased the inherent risk, the doctrine of implied unreasonable assumption of risk applied. They further argue that because implied unreasonable assumption of risk permits apportionment of fault, no assumption of risk instruction should have been given since the court's contributory fault instruction sufficed to apportion fault. This court reviews jury instructions de novo. *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635, 244 P.3d 924 (2010) (plurality opinion).

14

Washington law recognizes four categories of assumption of risk: (1) express, (2) implied primary, (3) implied reasonable, and (4) implied unreasonable. *Hvolboll v. Wolff Co.*, 187 Wn. App. 37, 47, 347 P.3d 476 (2015). The first two types—express and implied primary—are complete bars to recovery. *Gleason v. Cohen*, 192 Wn. App. 788, 794, 368 P.3d 531 (2016). The latter two types—implied reasonable and implied unreasonable—are essentially forms of contributory negligence and merely reduce the plaintiff's recoverable damages based on comparative fault. *Id.* at 795.

"*Express* and *implied primary* assumption of risk arise where a plaintiff has consented to relieve the defendant of a duty to the plaintiff regarding specific known risks." *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987). *Kirk* emphasizes that both of these types of assumptions of risk are based on the plaintiff's consent to a negation of the defendant's duty:

> Where express assumption of risk occurs, the plaintiff's consent is manifested by an affirmatively demonstrated, and presumably bargained upon, express agreement. Implied primary assumption of risk is similarly based on consent by the plaintiff, but without the additional ceremonial and evidentiary weight of an express agreement. . . . The basis of these two types of assumption of risk is the plaintiff's consent to the negation of a duty by the defendant with regard to those risks assumed by the plaintiff.

*Id.* at 453-54 (internal quotation marks and citations omitted).

15

In *Oak Harbor*, Justice Chambers, concurring, noted:

The difference between express assumption of risk and implied primary assumption of risk is ceremonial and evidentiary. . . . The effect of implied primary assumption of risk and express assumption of risk is also identical—both result in a complete bar to recovery with regard to the specific risk assumed. While express assumption of risk requires evidence that the claimant has expressly assumed a specific risk, implied primary assumption of risk requires evidence that if the claimant failed to expressly assume a specific risk, the claimant's actions were tantamount to expressly assuming a specific risk. Because the evidentiary standard is so high, this court has never applied implied primary assumption of risk to bar recovery in any case. Implied primary assumption of risk should accordingly be applied with caution and with a proper understanding of the principles underlying the doctrine.

*Oak Harbor*, 170 Wn.2d at 644-45 (internal quotation marks and citations omitted).

The facts here fall short of the high evidentiary standard required for application of implied primary assumption of risk. Mr. Edwards asked Mr. Harris, CMS's employee, if he should turn his truck around so the angle of the ramps would be lessened. Mr. Harris responded that people load ATVs there all the time, and that turning the truck around would not make much difference. These facts do not support the notion that Mr. Edwards was fully informed of the relevant risks and consented to relieve CMS of its duty to provide a reasonably safe premises. Rather, Mr. Harris's assurances caused Mr. Edwards to believe the risk he was about to take was minimal or nonexistent. In addition, there was no evidence that Mr. Edwards was informed of the risk posed because of the ATV's

16

close proximity to the ramps and the need for rapid acceleration of the ATV up the ramps.

CMS primarily argues that Mr. Edwards had a full understanding of the risk that the ATV could flip over. *See* Br. of Resp't at 21, 23-24. It cites his review of the documents and owner's manual, as well as his understanding of the risks associated with hill climbing. It also notes that Mr. Edwards could clearly see the parking lot's slope.

> By entering freely and voluntarily into any relation or situation where the negligence of the defendant is obvious, the plaintiff may be found to accept and consent to it, and to undertake to look out for himself and relieve the defendant of the duty.

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 485 (5th ed. 1984) (footnote omitted).

We agree that Mr. Edwards understood that there was some risk involved in loading his ATV into his truck, given the steep slope of the ramps. But we disagree that the risk here was sufficiently obvious that Mr. Edwards should be found to have consented to the risk so as to relieve CMS of its duty. If the risk was so obvious, it should have been obvious to Mr. Harris. But it was not. Rather than telling Mr. Edwards that the steep angle of the ramps created a risk that the ATV would flip while being loaded, Mr. Harris allayed Mr. Edwards's concerns. Mr. Harris assured Mr. Edwards that ATVs were loaded into trucks there all the time and that turning the truck around would not make much difference. In an extreme case, the risk an ATV will flip is obvious. This is

17

not an extreme case. For this reason, the trial court erred in instructing the jury on implied primary assumption of risk.[3]

### 2. GENERAL NEGLIGENCE CLAIM

CMS argues the Edwardses waived their general negligence claim because they never argued or proposed an instruction on it. However, in responding to CMS's motion for a directed verdict, the Edwardses expressly argued that Mr. Harris had a separate duty not to give them misleading instructions or false assurances of safety, which was distinct from their premises liability claim. The Edwardses' argument sufficiently preserved their claim.

CMS also argues that the Edwardses could not bring a general negligence claim because landowners do not owe a general standard of reasonable care under all circumstances. CMS cites *McKown v. Simon Property Group, Inc.*, 182 Wn.2d 752, 344 P.3d 661 (2015) in support of their argument. However, in *McKown*, the court

---

[3] This court recently distinguished implied primary assumption of risk from unreasonable assumption of risk on the basis that the former does not apply whenever the defendant created the risk. *Gleason*, 192 Wn. App. at 800. We question this distinction for two reasons. First, *Oak Harbor*, our Supreme Court's most recent case on the subject, does not note this distinction. Second, leading authorities confirm that primary assumption of risk applies even when the defendant creates the risk. *See Restatement (Second) of Torts* § 496C(1) (1965); KEETON ET AL., *supra*, at 485-86; *see also Kirk*, 109 Wn.2d at 452-54.

simply held that it would not abandon the common law classifications of invitees, licensees, and trespassers, and replace them with a general standard of care regardless of the plaintiff's status. *Id.* at 765. The *McKown* court never held or implied that plaintiffs cannot assert both premises liability and general negligence claims when the facts support both theories.

Under general negligence principles, "if injury is caused by the *acts* of the defendants (misfeasance), a duty to use reasonable care to avoid injury will be assumed." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 2:2, at 37-38 (4th ed. 2013). In other words, by creating a risk of harm, the person has a duty to ensure the harm does not happen. *Id.* § 2:4, at 44. On the other hand, when an injury results from a person's omission or failure to act, there will be no liability unless the person voluntarily assumed the duty to protect the other from harm. *Id.* § 2:2, at 37-38.

For example, in *Alston v. Blythe*, 88 Wn. App. 26, 943 P.2d 692 (1997), a truck driver, Steven McVay, waved a pedestrian, Gloray Alston, across lanes of traffic and did not notice a car approaching in the next lane or warn Alston of the car. *Id.* at 29-30. The car hit Alston. *Id.* The *Alston* court explained the truck driver assumed a duty:

> Before he stopped his truck, . . . [McVay] did not owe a duty to help Alston cross the street safely; that was solely her responsibility. Even after he stopped his truck, he still did not owe a duty to help Alston cross the street safely—unless and until he undertook to wave her in front of the truck and across the southbound lanes. If he did that, a jury could find that he assumed a duty to help Alston cross the street; that he was obligated to discharge that duty with reasonable care; and that he failed to exercise reasonable care by not perceiving [the oncoming car], or by failing to warn of [its] presence.

*Id.* at 37 (emphasis omitted).

Here, the Edwardses' general negligence and premises liability claims were based on different duties that CMS owed them. They asserted a premises liability claim based on CMS's duty as the owner and operator of the premises. Their theory supporting this claim was that the slope of the parking lot created an unreasonably dangerous condition for loading ATVs. In other words, this claim focused on the condition of the property itself.

In contrast, the Edwardses' general negligence claim was based on CMS's negligent *activity*, rather than the premises itself. After the Edwardses asked if they should turn the truck around to reduce the angle of the ramps, Mr. Harris stated that they "'[did] it right [t]here all the time,'" and that it did not make "'much difference.'" RP at 185, 362. Like the truck driver in *Alston*, Mr. Harris assumed a duty when he gave them assurances of safety. At that point, he was obligated to discharge that duty with

20

reasonable care. Because the evidence permitted a trier of fact to find in favor of the Edwardses on their general negligence claim, the trial court erred by dismissing this claim as a matter of law.

## CONCLUSION

We conclude the trial court erred when it instructed the jury on implied assumption of risk. The trial court should not have instructed on implied assumption of risk, but instead should have allowed the jury to apportion fault based on the contributory fault instruction. We also conclude the trial court erred by dismissing the Edwardses' general negligence claim as a matter of law.

The Edwardses therefore are entitled to a new trial on both of their claims. For this reason, their assertions that CMS violated the motion in limine and that the special verdict form was improper are both moot.

Reverse and remand for a new trial.

No. 34449-5-III
*Edwards v. Colville Motor Sports*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Fearing, C.J.                                              Siddoway, J.

No. 34449-5-III

SIDDOWAY, J. (concurring) — Too many cases in which implied primary assumption of the risk is asserted as a defense are necessarily overturned on appeal because of a failure to identify and instruct the jury on the relevant risk. The problem might be alleviated if the Washington pattern jury instructions recommended that the jury be explicitly instructed on the relevant risk.

The problem appears often to arise in cases like this one: A plaintiff engages or is about to engage in an activity that presents a risk of which the plaintiff is aware (the "original" risk). The defendant is present and engages in conduct that lowers the plaintiff's guard. If the defendant's conduct is negligent, the relevant risk for assumption of risk purposes is not the original risk. It is, instead, the risk that the defendant will fail to carry out a duty owed to the plaintiff.

If the relevant risk in such cases is properly identified, trial courts should recognize that it is unlikely to be supported by evidence, as Justice Chambers pointed out in his concurring opinion in *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 644-45, 244 P.3d 924 (2010) (plurality opinion). And in the unusual case where the defense *is* supported by evidence, instruction on the relevant risk means we will not be faced as often as we are now with the need to reverse.

Several reported decisions illustrate the problem. The negligence alleged by the plaintiff in *Dorr v. Big Creek Wood Products, Inc.* was that the defendant's principal

1

waved him forward in a logging area despite a dangerous widow-maker suspended in branches overhead. 84 Wn. App. 420, 423-24, 927 P.2d 1148 (1996). The trial court refused to instruct on implied primary assumption of the risk, having been persuaded that the total bar would not apply if there was arguably negligence on the part of the defendant. *Id.* at 426. This court held that the trial court erred because the defense of implied primary assumption of the risk "remains viable," "occupy[ing] its own narrow niche." *Id.* at 425-26.

This court nonetheless affirmed the trial outcome, concluding that the evidence provided no basis for a finding that Mr. Dorr assumed the relevant risk. The relevant risk was not the original risk of encountering a widow-maker where trees are being felled, a risk of which Mr. Dorr was aware. It was instead the risk that the defendant's principal would breach the duty to avoid giving misleading directions. *Id.* at 430. And "[n]othing about Dorr's conduct manifested or implied his consent to release Big Creek from the duty to avoid misdirecting him." *Id.*

Similarly, in *Alston v. Blythe*, 88 Wn. App. 26, 33, 943 P.2d 692 (1997), the plaintiff, a pedestrian, contended that the defendant truck driver, who had stopped to let her cross a four-lane road, negligently waved her across another lane of traffic. The trial court instructed on implied primary assumption of the risk, but this court concluded that it did so in error. Given Ms. Alston's theory of liability, the availability of the defense turned on whether Ms. Alston assumed the risk that the truck driver would not perform the duty of ordinary care owed her as a matter of law or, stated differently, whether she

2

consented to relieving the driver and his employer of that duty. *Id.* at 34-35. It was not whether she was aware of and assumed the original risk of crossing the street without the protection of a marked crosswalk. There was no evidence that Ms. Alston consented to relieve the defendants of their duty of care. This court observed that in most situations, the evidence will not support such consent. *Id.*

*Erie v. White*, 92 Wn. App. 297, 966 P.2d 342 (1998) was, like *Alston*, an opinion authored by Judge Dean Morgan, but one that illustrates evidence that supports instructing the jury on implied primary assumption of the risk. Mr. Erie agreed to perform tree trimming work if the defendant provided the necessary equipment. Mr. Erie recognized on arriving at the defendant's home that the defendant had negligently provided pole climbing rather than tree climbing equipment. The critical difference is that pole climbing equipment has a leather safety strap whereas tree climbing equipment has a steel reinforced safety strap so that a person using a chain saw cannot cut through it accidentally. *Id.* at 299.

Mr. Erie proceeded to perform the work with the pole climbing equipment and was injured when he accidentally cut through the safety strap with his chain saw. The court observed that Mr. Erie himself testified that when he looked at the equipment provided, "he realized it was pole-climbing equipment that did not have the steel-reinforced safety strap needed when using a chain saw high in a tree." *Id.* at 306. The evidence supported the defense contention that Mr. Erie was aware of more than the

3

original risk associated with tree trimming—he was aware of and assumed the risk that the defendant would negligently provide the wrong equipment. *Id.* at 306.

More recently, in *Jessee v. City Council of Dayton*, 173 Wn. App. 410, 413, 293 P.3d 1290 (2013), this court affirmed a trial court finding of implied primary assumption of risk where a plaintiff encountered a negligently constructed stairway and proceeded to use it. Before proceeding up the stairs, Ms. Jessee commented that they "were not 'ADA compliant'[1] and looked 'unsafe.'" *Id.* at 412. On later descending the stairs, she fell. Because no agent of the defendant engaged in a negligent act or omission that put Ms. Jessee off her guard, the relevant risk was the original risk of the hazardous stairway, which she knowingly assumed.[2]

In this case, the trial court did not correctly identify the relevant risk. This is borne out by the instructions it gave after deciding to submit the defense to the jury, in which the risk identified was "the risk of driving the ATV up the ramp." Clerk's Papers at 335 (Instruction 8). Given the Edwardses' theory of negligence, the relevant risk was that Colville Motor Sports (CMS) and its employees would breach the duty to avoid giving misleading directions. *Id.* at 430. As was the case in *Dorr*, nothing about the

---

[1] Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213.

[2] Plaintiffs who freely and voluntarily enter unsafe stairways is an example of implied primary assumption of the risk identified in the Prosser and Keeton treatise relied on by the Washington Supreme Court for our current common law. *See* W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 68, at 486 (5th ed. 1984). The treatise was relied on in *Shorter v. Drury*, 103 Wn.2d 645, 655-56, 695 P.2d 116 (1985) and *Kirk v. Washington State University*, 109 Wn.2d 448, 452-54, 746 P.2d 285 (1987).

4

Edwardses' conduct manifested or implied consent to release CMS from the duty to avoid misleading them.

Many of our superior courts see cases such as these infrequently, and the importance of identifying the relevant risk where more than one risk is present can be overlooked. This is so even where, as here, a veteran trial judge and experienced lawyers spent considerable time trying to get the law and the instructions right. I reiterate my encouragement to the Washington Pattern Instruction Committee that it review this issue.

_Siddoway, J._

Siddoway, J.

I CONCUR:

_Fearing, J._

Fearing, C.J.