IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JOUMANA B. AL HAYEK, and NICHOLAS C. PHILLIPS, and the marital community composed thereof, | ) ) ) ) | No. 39989-3-III |
| Appellants, | ) ) | |
| v. | ) ) | |
| KATHRYN MILES, M.D., individually; NORTHWEST OB-GYN, P.S., a Washington Corporation, | ) ) ) ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| PROVIDENCE HEALTH & SERVICES, a Washington Corporation, and PROVIDENCE HEALTH & SERVICES—WASHINGTON, a Washington Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

LAWRENCE-BERREY, C.J. — Joumana Al Hayek and Nicholas Phillips, wife and husband, appeal after a jury's defense verdict. They argue the trial court erred by denying their motion for new trial because the jury's verdict was affected by race or ethnicity. They also argue the trial court committed reversible evidentiary and instructional error.

With respect to their first argument, the first step of the two-step inquiry is whether an objective observer, as defined in GR 37(f), "could" view race or ethnicity as a factor in the verdict. We clarify that "could," in this context, means a reasonable possibility. We review this claim of error de novo, and conclude that an objective observer could not view race or ethnicity as a factor in the verdict. We also conclude that the trial court did not commit reversible evidentiary or instructional error. Accordingly, we affirm.

FACTS

Joumana Al Hayek and Nicholas Phillips filed an action against Dr. Kathryn Miles and Northwest OB-GYN, PS, for medical malpractice relating to the delivery of their second child. Although the child was born healthy, Al Hayek's uterus ruptured during the long painful labor, and she no longer can have children.

At trial, Al Hayek and Phillips argued two theories of recovery, relevant here: (1) Al Hayek did not give informed consent to vaginal birth after cesarean (VBAC)[1] because Dr. Miles failed to use an interpreter to inform her of the risks, and (2) Dr. Miles

---

[1] Al Hayek's first child was delivered by emergency cesarean section (C-section). For her second child, she wanted to give birth vaginally, referred to as VBAC. Because the uterus is cut open during a C-section and may not fully heal, VBAC carries some risk that the uterus might rupture.

was negligent for not discontinuing Pitocin[2] earlier, and for proceeding with VBAC despite warning signs.

The first theory of recovery required Al Hayek to explain to the jury why she did not fully understand the written and verbal VBAC disclosures provided to her by Dr. Miles. Al Hayek explained she was born and raised in Palestine, that Arabic was her native language, and that her culture differed from American culture because women were not educated about sex or the biology of sex. She also explained, while she could speak English well enough, understanding written English was more difficult. While Al Hayek emphasized facts about her ethnic heritage, Dr. Miles emphasized how well Al Hayek communicated in English. The defense emphasized Al Hayek's employment history, which required her to communicate with customers in English, and her marriage, because her husband speaks English, not Arabic.

As in every trial, issues arose that required the trial court to make contested rulings. We describe those rulings in greater depth in the next section, where we pair the arguments raised by Al Hayek and Phillips with the relevant facts and applicable law.

After trial concluded, the jury rendered a defense verdict. Al Hayek and Phillips filed a motion for new trial, in which they argued that the jury's verdict was affected by

---

[2] Pitocin can accelerate delivery because it increases the strength of the contractions.

ethnic bias. They focused on remarks by defense counsel in opening—that Dr. Miles is from this part of the world and that Spokane is her town; they also focused on a portion of defense counsel's closing—repeatedly describing Al Hayek's family as close-knit. Both parties submitted declarations and legal briefing to the trial court, and the court held a hearing. The trial court issued a letter ruling that denied the motion.

Al Hayek and Phillips appeal to this court.

LAW AND ANALYSIS

Al Hayek and Phillips raise three arguments on appeal for why they are entitled to a new trial: (1) the trial court erred in denying their motion for new trial, (2) evidentiary error, and (3) instructional error. We address these arguments in turn.

A.    DENIAL OF MOTION FOR NEW TRIAL

Focusing on *Henderson v. Thompson*, 200 Wn.2d 417, 518 P.3d 1011 (2022), Al Hayek and Phillips argue they are entitled to a new trial because the jury's verdict was affected by ethnic bias.[3] As noted above, they focus on remarks defense counsel made in opening, and a phrase defense counsel repeated in closing.

---

[3] We note that *Henderson* speaks only of racial bias, not ethnic bias. The parties have not briefed whether the two-step inquiry, discussed in *Henderson*, applies to claims of ethnic bias. It is reasonable to assume it does. *Henderson* cites *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022), and adopts the GR 37(f) "objective observer" standard. Both *Zamora* and GR 37 discuss racial *and* ethnic bias. *See also Simbulan v. Nw. Hosp. & Med. Ctr.*, 32 Wn. App. 2d 164, 175-76, 555 P.3d 455 (2024) (assuming, without

*Defense counsel's opening remark*

During opening, plaintiffs' counsel explained the concept of informed consent, and discussed the reasons why Al Hayek was not fully informed of the risks of VBAC. Plaintiffs' counsel stated that Dr. Miles knew that Al Hayek's primary language is Arabic, and that Al Hayek was from Palestine and came to the United States in the early 2000s. Counsel told the jury it would hear about Al Hayek's Palestinian culture and how it is different, because there is no sex education, no discussion about sexual anatomy, and no talking about sex.

During defendants' opening, defense counsel explained the procedures Dr. Miles used to ensure that patients were provided interpreters when interpreters were requested or required to properly communicate. Counsel told the jury that Al Hayek had been in the United States since 2003, had completed a community college course to learn English, and had worked many jobs that required her to speak and understand English. Counsel further explained that, although Al Hayek had visited health care providers over one hundred times before the delivery of her second child, not once had she asked for an interpreter. Counsel then transitioned to introduce his client, Dr. Miles:

discussion, that the two-step inquiry discussed in *Henderson* applies to claims of ethnic bias).

> My pleasure to talk with you now a little bit more about my client,
> Dr. Miles. *Dr. Miles is from this part of the world.* She grew up in
> Pullman. . . .
> She went to Gonzaga. She grew up here. *This is her town.*

2 Rep. of Proc. (RP) (Feb. 15, 2023) at 515 (emphasis added).

After opening statements, plaintiffs' counsel objected to the description of Dr.

Miles being from "this part of the world," and argued it violated *Henderson*. 2 RP

(Feb. 15, 2023) at 546. Defense counsel denied any intent to improperly bias the jurors.

The court ruled,

> As far as Dr. Miles being from this part of the world, I think that
> statement was just a little bit too broad. I understand that she's from this
> area or this region.
> But when we say [she's] from this part of the world, it draws a
> distinction between someone from this country . . . and someone from
> another part of the world. That might not be intentional, but statements like
> that could cause jurors to unintentionally . . . look to certain types of
> stereotypes.

2 RP (Feb. 15, 2023) at 547-48.[4]

*Defense counsel's closing remarks*

During summation, defense counsel challenged Al Hayek's claim that she did not

understand English well enough to give informed consent:

---

[4] In its letter decision denying a new trial, the court noted that defense counsel's
opening remark could, *but for* the evidence Al Hayek presented at trial, cause an
objective observer to view race as a factor in the verdict.

[Y]ou heard testimony about the language capabilities of Ms. Alhayek, and let's talk about who the plaintiffs called to address those issues. They called Ms. Alhayek's mother. Ms. Alhayek's mother had multiple vaginal deliveries. Ms. Alhayek, the plaintiff, wanted a vaginal delivery. They were a *close-knit family*. They called her father. They called [her] sister, Jane; twin sister Jane. . . . Jane took the English class with Ms. Alhayek and is now in pharmacy school. That's her twin. You heard from her brother Issa, who helped [Ms.] Alhayek with language in that course she took. This was a *close-knit family*. *They cared about each other, as most families do.*

You heard from Nick Phillips, her husband. He doesn't speak Arabic. The children don't speak Arabic. He's at every appointment with her, and he filled out forms for her, with her help, and helped her understand medical terms.

But in a trial like this, especially as many days as we've been here, you hear evidence and you hear witnesses. But also what you consider is what you don't hear, who doesn't come here, who doesn't testify.

With the family, the *close knit family*, there's obviously bias with how they're describing her language ability; obvious bias.

But let's talk about who they didn't call. Where were the friends that see them on a daily basis and socialize with them that would tell you she doesn't understand English, she doesn't read English? Or the neighbors that live by them? Where were the coworkers? Olive Garden[.] The [b]arbers that she worked at, where she testified she didn't need an interpreter anyway. Where were the customers? Just worked as recently as 2019. . . . Why didn't they testify?

We've been here for 14 days. There's been not one testimony—bit of testimony that Ms. Alhayek or Mr. Phillips ever asked Dr. Miles for an interpreter, they ever asked anyone at Northwest OB/GYN for an interpreter. Where's the testimony? What you don't hear is also part of the case.

6 RP (Mar. 7, 2023) at 2653-55 (emphasis added).

7

No. 39989-3-III
*Al Hayek v. Miles*

*The two-step inquiry discussed in* Henderson

"We have long recognized that Washington courts have the inherent power to grant a new trial on the ground that substantial justice has not been done." *Henderson*, 200 Wn.2d at 430. Courts have described this power "not only as within a trial judge's *authority* but as part of their affirmative *duty*." *Id*.

For determining whether racial or ethnic bias affected a jury's verdict, *Henderson* adopted the two-step GR 37(f) "objective observer" inquiry from *State v. Berhe*, 193 Wn.2d 647, 664-65, 444 P.3d 1172 (2019).

> We hold that upon a motion for a new civil trial [based on a claim that racial bias affected the verdict], courts must ascertain whether an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State could view race as a factor in the verdict. When a civil litigant makes a prima facie showing sufficient to draw an inference of racial bias under this standard, the court must grant an evidentiary hearing to determine if a new trial is warranted. At the hearing, the trial court is to presume that racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did not. If they cannot prove that racial bias had no effect on the verdict, then the verdict is incompatible with substantial justice, and the court should order a new trial under CR 59(a)(9).

*Henderson*, 200 Wn.2d at 435 (emphasis and citations omitted) (underlining added).

To correctly analyze the first part of the two-step inquiry, we need to determine the meaning of "could," in the context of "whether an objective observer . . . *could* view race [or ethnicity] as a factor in the verdict." *Id*. This court recently held that "could" in

8

this context means "'made possible or probable by circumstances.'" *Simbulan v. Nw. Hosp. & Med. Ctr.*, 32 Wn. App. 2d 164, 176, 555 P.3d 455 (2024) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 323 (2002)). But because "possible" and "probable" mean different things—one less than 50 percent, and the other more than 50 percent—this standard risks uneven application by trial courts. We take this opportunity to clarify the standard. Although *anything* is "possible," the *Simbulan* court rejected this broad notion of what "could" means. *Id.* We clarify that "could" means a "reasonable possibility."

As part of its decision denying a new trial, the trial court also denied a request for a *Henderson* hearing, the second part of the two-step inquiry described earlier in the lengthy *Henderson* quote. Whether the trial court erred in denying a *Henderson* hearing is a question we review de novo. *Id.* at 175.

*De novo review of denial of* Henderson *hearing*

Our Supreme Court has given us guidance on how to determine whether racial or ethnic bias affected a jury's verdict. "Under this objective observer standard, we consider the content and subject of the statements, the frequency of the remarks, the apparent purpose of the statements, and whether the comments were based on evidence or reasonable inferences in the record." *State v. Bagby*, 200 Wn.2d 777, 793, 522 P.3d 982

9

(2023) (citing *State v. Zamora*, 199 Wn.2d 698, 718-19, 512 P.3d 512 (2022); *State v. Monday*, 171 Wn.2d 667, 678, 257 P.3d 551 (2011)).

We now consider defense counsel's statement in opening that Dr. Miles is from this part of the world and that this is her town. The remarks were based on evidence that was produced at trial, but the apparent purpose of the remarks was to cause jurors to identify more closely with Dr. Miles than Al Hayek, who is not from this part of the world or Spokane. This is an "us-versus-them" argument. After *Henderson*, it is clear that such arguments are improper when the "them" is a person of color or an ethnic minority.

To determine whether the remarks could have played a factor in the verdict, we must consider the frequency of these and similar remarks. Here, these remarks were only made once, during opening, and Al Hayek and Phillips do not assert that they or similar remarks were repeated after the trial court put defense counsel on notice. Also, we note that Al Hayek presented evidence consistent with the remarks, and that the remarks supported one of her central arguments—that she did not understand the consent form because she is from another country, with a different language and culture. We agree with the trial court's determination in its letter decision, that, *but for* the evidence produced by Al Hayek, an objective observer could view race or ethnicity as a factor in the jury's verdict.

We next consider defense counsel's statements in closing, repeatedly describing Al Hayek's family as close-knit. The description was based on evidence Al Hayek presented at trial. The apparent purpose for defense counsel describing the family as close-knit was to cast doubt on Al Hayek's claim that she was not proficient in English. Defense counsel's argument was that the only witnesses who supported Al Hayek's claim of limited English proficiency were close family members, and they were obviously biased. This is an argument made every day in court—the stronger the affinity between the party and the witness, the less the witness should be believed. This argument applies equally to all ethnicities. Moreover, the phrase was not used in a pejorative manner. Defense counsel explained when making his argument, "This was a close-knit family. They cared about each other, as most families do." 6 RP (Mar. 7, 2023) at 2654.

After applying the *Bagby* factors and the proper definition of "could," we, similar to the trial court, conclude that an objective observer, as described in GR 37(f), could not view race or ethnicity as a factor in the jury's verdict. We conclude that the trial court did not err in denying the request for a *Henderson* hearing and a new trial.

B.     CLAIM OF EVIDENTIARY ERROR

Al Hayek and Phillips argue the trial court abused its discretion by excluding evidence of a conversation between Dr. Miles and a nurse about the continued

11

administration of Pitocin. To place this argument in context, we first discuss the facts
and arguments that precipitated the trial court's ruling.

At trial, defense counsel objected when Phillips was asked about a disagreement
between Dr. Miles and a nurse concerning the continued administration of Pitocin.
Plaintiffs' counsel conceded the details of the disagreement were not needed other than to
establish a timeline of Dr. Miles' involvement, and when the Pitocin was administered.
The court allowed Phillips to reference the discussion to establish a timeline, but did not
allow testimony of the disagreement.

Later, defense counsel objected when Al Hayek was asked about the disagreement
between Dr. Miles and the nurse. Prior to Al Hayek's testimony, defense expert Dr.
Heath Miller had expressed confusion on why the level of Pitocin would have been
increased after 11:20 a.m. Plaintiffs' counsel argued the nurse's disagreement tended to
show that Dr. Miles violated the standard of care. The trial court sustained defense
counsel's objection, and precluded Al Hayek from testifying about the disagreement.

Plaintiffs' counsel later made an offer of proof. Counsel explained that the
disagreement occurred at 10:20 a.m., when Dr. Miles met Al Hayek in the delivery room,
and after the doctor was told of Al Hayek's unusual pain. Dr. Miles directed the nurse to
augment the Pitocin, and the nurse asked the doctor if she was sure, and the doctor
responded either, "I am the doctor here or who's the doctor here." 3 RP (Feb. 28, 2023)

at 1441-42. At 10:49 a.m., minutes after Dr. Miles left the room, the nurse augmented the Pitocin as instructed. Sometime between 11:10 a.m. and 11:20 a.m., the nurse became aware that the baby's heart had begun to decelerate, and that Al Hayek's pain had increased, yet she did not call Dr. Miles back to the delivery room until 11:38 a.m., which was too late.

In conjunction with the offer of proof, plaintiffs' counsel argued that the disagreement was relevant *because it explained why the nurse delayed calling Dr. Miles back to the delivery room*. The trial court believed that the line of questioning was premature, because the defense had not yet put on evidence to explain the nurse's delay. Plaintiffs' counsel asked, "[I]f they do have a fact witness [to address the delay], we could use [the disagreement] in rebuttal?" 3 RP (Feb. 28. 2023) at 1445. The trial court answered, "Potentially." *Id.*

On appeal, Al Hayek and Phillips argue that the excluded evidence was relevant *because it showed that Dr. Miles had notice as early as 10:20 a.m. that continued administration of Pitocin was a problem*. Br. of Appellants at 72-73. This notice argument is not what plaintiffs argued at trial—either in response to the objections during their testimonies, or in conjunction with their offer of proof. We decline to address this new argument on appeal. *See* RAP 2.5(a) (generally, we will not review a claim of error not raised in the trial court); *State v. Lile*, 188 Wn.2d 766, 787 n.14, 398 P.3d 1052

13

(2017) (a party cannot claim an abuse of discretion for not admitting evidence based on a theory not argued to the trial court).

In addition, as noted above, the trial court did not foreclose plaintiffs from introducing evidence of the disagreement; rather, it determined that the nurse should first testify why she did not earlier call Dr. Miles back to the delivery room, and that the disagreement was "[p]otentially" admissible as rebuttal evidence. 3 RP (Feb. 28. 2023) at 1445. For these reasons, we reject this claim of error.

C. CLAIM OF INSTRUCTIONAL ERROR

Al Hayek and Phillips argue the trial court committed prejudicial error by denying two instructions and by giving a third. Before addressing each argument, we set forth the general law with respect to a claim of instructional error.

"The general test for reviewing jury instructions is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not misleading, and properly inform the trier of fact of the applicable law." *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 460, 746 P.2d 285 (1987). "'Whether to give a certain jury instruction is within a trial court's discretion and so is reviewed for abuse of discretion.'" *Wright v. 3M Co.*, 1 Wn.3d 795, 805, 533 P.3d 113 (2023) (quoting *Fergen v. Sestero*, 182 Wn.2d 794, 802, 346 P.3d 708 (2015)). "Deciding whether to give a particular jury instruction is a highly fact-specific issue because '[e]ach case before the court presents different facts,

14

and it is impossible to have one formula fit all unique situations.'" *Id.* (quoting *Fergen*, 182 Wn.2d at 811). "Trial court error on jury instructions is not a ground for reversal unless it is prejudicial." *Stiley v. Block*, 130 Wn.2d 486, 498-99, 925 P.2d 194 (1996). "An error is prejudicial if it affects the outcome of the trial." *Id.* at 499.

### 1.    *Informed consent instruction*

Al Hayek and Phillips argue the trial court abused its discretion by failing to fully instruct the jury on the law of informed consent.

To be clear, the trial court did instruct the jury on the law of informed consent, and did so by giving "Instruction 14"[5] and "Instruction 15."[6]

---

[5] Instruction 14 provided in relevant part:
An obstetrician has a duty to inform a patient of all material facts, including risks and alternatives, that a reasonably prudent patient would need in order to make an informed decision on whether to consent to or reject a proposed course of treatment.
The duty to disclose a material risk is continuing and arises whenever a healthcare provider becomes aware of any material risks.
A material fact is one to which a reasonably prudent person in the position of the patient would attach significance in deciding whether or not to submit to the proposed course of treatment.
Clerk's Papers (CP) at 1678.

[6] Instruction 15 provided in relevant part:
In connection with Plaintiffs' claim of injury as a result of Defendant Kathryn Miles, M.D.'s failure to obtain the patient's informed consent to the treatment undertaken, Plaintiffs have the burden of proving each of the following propositions:

Two weeks before trial, defense counsel filed proposed instructions, including an instruction loosely based on RCW 7.70.060(1), telling the jury that a signed consent form is prima facie evidence that consent was given. Toward the end of trial, plaintiffs' counsel filed a written objection to this proposed instruction, arguing that it misstated the law because it failed to include subpart (a) of the informed consent statute.[7] The next

---

First, that Defendant Kathryn Miles, M.D. failed to inform Mrs. Alhayek of a material fact or facts relating to the treatment;

Second, that Mrs. Alhayek consented to the treatment without being aware of or *fully informed* of such material fact or facts;

Third, that a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts; and

Fourth, that the treatment in question was a proximate cause of injury to the patient.

CP at 1679 (emphasis added).

[7] RCW 7.70.060 provides:
(1) If a patient who has capacity to make health a care [a health care] decision, or his or her representative if he or she does not have the capacity to make a health care decision, signs a consent form which sets forth the following, the signed consent form shall constitute prima facie evidence that the patient gave his or her informed consent to the treatment administered and the patient has the burden of rebutting this by a preponderance of the evidence:
(a) A description, in language the patient could reasonably be expected to understand, of:
(i) The nature and character of the proposed treatment;
(ii) The anticipated results of the proposed treatment;
(iii) The recognized possible alternative forms of treatment; and
(iv) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment and in the recognized possible alternative forms of treatment, including nontreatment.

16

day, when the parties conferred about the instructions, defense counsel stated he was withdrawing the proposed instruction. About an hour later, plaintiffs' counsel informed the court he wanted an instruction that set forth RCW 7.70.060(1)(a) in its entirety.

The trial court gave two reasons for refusing this request. First, the court thought an instruction that quoted the entire statute would be confusing because the statute included the terms "capacity" and "prima facie," and neither party had submitted instructions that defined those terms. 6 RP (Mar. 7, 2023) at 2574. Second, granting the request would cause further delay. The court explained:

> We've been here for four weeks, and I don't have this instruction proposed by the plaintiffs. I have an instruction proposed by the defense that's, like, one sentence long. If the plaintiff wants me to give this instruction, . . . I would have to, on my own time, right now, go try to draft this instruction with the subparts, with the definition for prima facie. And I know I'm a little bit too sympathetic to these jurors, but these jurors have been sitting in the jury room . . . for the last hour and a half, waiting to come out here and hear closing arguments. And we still don't have the jury instructions finalized. . . .
> So I'll decline that instruction.

*Id.* at 2575-76.

There are two reasons we reject this claim of error. First, Al Hayek and Phillips failed to timely file their proposed instruction. CR 51(e) permits a trial court to disregard a proposed instruction not submitted in accordance with CR 51. Generally, proposed instructions must be submitted when the case is called for trial. CR 51(a). An exception

17

permits late filing if the need for the instruction could not reasonably be anticipated. CR 51(a). This exception has no application here. Lack of informed consent was one of the plaintiffs' central theories, raised in their complaint and at trial. Plaintiffs' counsel, undoubtably, was aware of the informed consent statute, and certainly could have timely proposed an instruction quoting RCW 7.70.060(1)(a). Second, the instructions given allowed Al Hayek and Phillips to argue their theory that Al Hayek was not provided informed consent because the disclosures were not given in Arabic.

        2.      *Instruction that Phillips had no duty to assist Dr. Miles in providing Al Hayek informed consent*

Al Hayek and Phillips next argue the trial court erred by not giving their proposed instruction advising the jury that the law placed no duty on Phillips to inform Al Hayek of the material facts of a proposed course of treatment or to ensure that a medical provider follows the standard of care.

The trial court explained its reason for not giving the proposed instruction was that its instructions already placed the burden on Dr. Miles for informing Al Hayek of the material facts and adhering to the standard of care. The trial court additionally assured plaintiffs' counsel, "[I]f you stood up in front of the jury and read this in your closing argument, that would be just fine, but it doesn't seem that they need to have a separate

instruction . . . ." 6 RP (Mar. 7, 2023) at 2535. In closing, plaintiffs' counsel made this point.

"If the trial court's jury instructions are otherwise sufficient, the court does not need to give the party's proposed instruction, though that instruction may be an accurate statement of the law." *Mut. of Enumclaw Ins. Co. v. Myohng Suk Day*, 197 Wn. App. 753, 767-68, 393 P.3d 786 (2017). Here, the trial court's instructions were sufficient for the jury to correctly understand that Dr. Miles, not Al Hayek's husband, was responsible for providing informed consent and adhering to the standard of care. We conclude the trial court did not abuse its discretion by refusing to give the proposed instruction.

### 3. *Exercise of judgment instruction*

Al Hayek and Phillips argue the trial court erred by giving the exercise of judgment instruction. The instruction stated:

> A physician is not liable for selecting one of two or more alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment, the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

Clerk's Papers at 1677. Without citing any authorities, they argue the instruction was erroneously given, and additionally, it amounted to a comment on the evidence. We disagree.

19

An exercise of judgment instruction is appropriate only in cases where medical negligence is raised, and if the physician faced a diagnostic or treatment choice that called for the physician's judgment. *Fergen*, 182 Wn.2d at 804-08. Whether a physician faces a "choice between treatments or diagnoses" is a "low bar." *Id.* at 807. A court abuses its discretion in giving the instruction when there is no evidence that the physician used their medical judgment to choose between alternative treatments. *Needham v. Dreyer*, 11 Wn. App. 2d 479, 492, 454 P.3d 136 (2019).

Al Hayek and Phillips argue that Dr. Miles was not confronted with two alternate choices of treatment because Al Hayek, around 10:20 a.m., told Dr. Miles that she wanted to discontinue the VBAC and proceed with a C-section. But this argument ignores Dr. Miles' testimony that Al Hayek never changed her mind about the VBAC procedure. The exercise of judgment instruction thus required the jury to determine if, in fact, Dr. Miles was faced with alternate choices, and, if so, at what point the VBAC ceased being a reasonable medical choice.

Al Hayek and Phillips additionally argue that the instruction amounted to a comment on the evidence. They argue the instruction reinforced the defense theory (that Dr. Miles had two reasonable medical choices) rather than the plaintiffs' theory (that Al Hayek changed her mind and told Dr. Miles she wanted to proceed with a C-section). As explained below, we disagree that the instruction was a comment on the evidence.

A physician is entitled to an exercise of judgment instruction if there are facts to support it, even if the facts are inconsistent with the patient's theory. *Fergen*, 182 Wn.2d at 810:

> We have . . . repeatedly affirmed the utility of having . . . the exercise of judgment instruction[ ] supplement the basic standard of care instruction in medical malpractice cases. Properly given and worded, this instruction does not misdirect the jury and is not confusing; it helps juries understand the complexity of the legal standard they are being asked to apply. . . . [T]he language of the instruction alerts jurors that they must resolve factual issues regarding the standard of care. The instruction requires the jury to find that in arriving at the diagnosis or treatment the physician exercised reasonable care and skill with the requisite standard of care.

*Id.* at 811 (citations omitted).

## CONCLUSION

The case was well presented to the jury with skilled counsel representing both sides. The jury's verdict was not affected by ethnic bias. The trial court's legal rulings were correct, and when called upon to exercise discretion, it did so reasonably.

Affirmed.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____     _____
Fearing, J.                          Staab, J.

21